J. Louis **MURFEE** et al., Appellants,

v.

**PHILLIPS PETROLEUM COMPANY** et al., Appellees.

No. 6214.

Court of Civil Appeals of Texas, El Paso.

Feb. 21, 1973.

Rehearing Denied March 21, 1973.

Evans, Pharr, Trout & Jones, Charles B. Jones, John A. Flygare, Lubbock, for appellants.

Griffis, Williams, Goodwin & Harrison, W. A. Griffis, Jr., San Angelo, Rassman, Gunter & Boldrick, Emil C. Rassman, Midland, E. M. Cage, Rufus N. McKnight, Jr., Dallas, Lloyd G. Minter, Kenneth Heady, c/o Phillips Petroleum Co., Bartlesville, Okl., Vinson, Elkins, Searls & Connally, Ben H. Rice, III, Houston, Stubbeman, McRae, Sealy, Laughlin & Browder, W. B. Browder, Jr., Harrell Feldt, Lynch, Chappell, Allday & Culp, Vann Culp, Joe V. Peacock, Legal Department, Phillips Petroleum Co., Midland, for appellees.

## OPINION

WARD, Justice.

This is a water pollution case filed by the appellants as owners of the surface estate of a seven section ranch against the four appellees who were the oil and gas

lessees and producers thereon. The action was for depreciated market value of the land, due to negligence and proximate cause for the salt water pollution of the underground water supply caused by the lessees' disposal of produced brine in unlined earthen surface disposal pits located on the seven sections. Trial was to a jury, and based upon the jury's findings to the 81 submitted special issues, judgment was entered by the trial Court that the plaintiffs-appellants take nothing. We affirm *the judgment of the trial Court.*

The seven sections are largely in Upton County though a portion of the property is in Reagan County. The original oil and gas lease, under which the lessees and operators acquired their interests, was executed in March, 1945, by B. Sherrod and his wife, as lessors. Partial assignments of the lease were thereafter acquired by appellees, Ashland Oil & Refining Company, Paul F. Barnhart, and Sunray DX Oil Company, Sun Oil Company being the latter's successor by merger. Oil was discovered under the lease in 1951 and the lessee operators drilled and completed some 35 oil wells on the property, mainly during the years 1951 and 1952. Commencing in 1951, some 17 unlined surface pits were constructed on the seven sections by these three appellees and were used to dispose of the oil field brines produced from the wells. Throughout the 1950's there was no market for produced brine, and the prevailing custom and practice in the area was to dispose of the salt water in surface pits. It is undisputed that during the period of oil operations on these lands that the defendants deposited between five to eight million pounds of pure salt into the various pits on the ranch.

Before the execution of the oil and gas lease and thereafter for many years, the surface of the land had been used only for grazing, which was the usual surface use of the land in that portion of Upton and Reagan Counties. About the year 1956, a surface tenant drilled a water well in the northeast quarter section of that section lying in the most northeasterly corner of the 4,480 acre ranch. This water well was drilled some 224 feet from a salt water disposal pit constructed and used originally by Paul F. Barnhart. The 160 acres in this quarter section was broken for cultivation and was farmed thereafter for two years, when the farm and the water well were abandoned. This so-called "1956 Sherrod irrigation well" was uncased and unplugged and remained as an abandoned well for approximately seven years, until November 15, 1963, when the plaintiffs below attempted to rehabilitate it and determined that its water was salty and was ruined for irrigation purposes. After November 16, 1963, and before the trial, the appellants had completed and their tenants had used four additional irrigation wells on this same northeast quarter section, each of which well is presently producing unpolluted water. In addition, two other water wells were completed on the ranch and these together with four existing windmill wells thereon are producing fresh water.

During July of 1962, the North Pembrook Sprayberry Unit was completed, and thereafter all operations on the seven section ranch were conducted by appellee, Phillips Petroleum Company, under the control and supervision of the working interest owners. For a period of more than a year thereafter and until a Railroad Commission "no pit" order became effective, Phillips continued to dispose of salt water in some of the pits which had been constructed and used by Sunray, Ashland, and Barnhart. By deeds, dated December 10, 1962, and January 2, 1963, B. Sherrod and his wife conveyed to their daughter, Mrs. Murfee, and the three Murfee children the seven sections excepting and reserving to the grantors all oil, gas and other minerals, the conveyances being also made subject to all oil and gas leases. It was on November 15, 1963, that the plaintiff below, Mr. Murfee, tested the water in the 1956 Sherrod irrigation well and discovered that the well was salty. After discovering the pollution in this irrigation

well, the appellants drilled three additional test wells by which they contended that they discovered additional salty and polluted subterranean water. These will be referred to as the Murfee test holes. The three test wells were drilled near the center of the sections lying to the west, the southwest and to the south of the section where the 1956 Sherrod water well was located. The appellees contend that these three test wells were purposely drilled near existing salt water disposal pits, that they were left uncased and unprotected and that it was through these uncased test holes that salt water also reached and polluted the fresh water.

The physical characteristics of the subsurface of the ranch are uniform and agreed upon. The top soil extends down to a depth of 6 feet. Beneath the top soil is then found a layer of caliche some 20 feet thick with approximately 30 percent porosity. Beneath the layer of caliche is a zone of limestone. This limestone barrier is approximately 100 feet thick over the entire ranch. It is beneath the limestone barrier that the Trinity fresh water sand is located. This sand is some 200 feet thick and is the only source of fresh water found under the ranch.

The crucial dispute concerned the nature of the 100 foot limestone barrier covering the Trinity fresh water sand. Appellants' hydrologists were of the opinion that the salt water deposited in all of the salt water pits was gradually penetrating and working its way down through the limestone barrier into the fresh water sand, and that there was an area of contaminated fresh water associated with each of the salt water pits which would progressively increase through the years. The hydrologists and geologists for the appellees maintained that the layer of limestone acted as an impenetrable and impervious barrier over the entire ranch and fully protected the Trinity fresh water sands. They were of the opinion that the salt water placed in the disposal pits became permanently lodged in the layer of porous caliche beneath the general

area of each pit; that the salt water would move laterally in the caliche above the limestone barrier, and some brine encountered the open uncased and unplugged 1956 Sherrod irrigation well and the three open and uncased Murfee test holes, and gravity then took the salt water down these open holes to the Trinity sands. The appellees' hydrologists were also of the opinion that had the 1956 Sherrod irrigation well and the three Murfee test holes been properly cased and cemented there would have been no contamination of the fresh water supply. As pointed out, the opinion testimony of the respective experts differed. However, they all agreed that except for the three Murfee test holes and the 1956 Sherrod water well there was no proven pollution on any part of the seven section ranch.

The appellants alleged the following acts of negligence against the appellees:

"A. The Defendants negligently permitted salt water to escape from their pits.

B. the Defendants negligently permitted salt water to penetrate into the sub-surface fresh water strata of Plaintiffs' land.

C. The Defendants negligently permitted salt water to collect in surface pits from which they knew, or in the exercise of ordinary care, should have known, such salt water would escape and percolate into and pollute Plaintiffs' fresh water supply.

D. The Defendants negligently failed to adopt any effective method of disposing of their salt water to prevent pollution of fresh water stratas.

E. The Defendants negligently permitted salt water to drain onto Plaintiffs' land and pollute fresh water stratas.

F. The Defendants in so disposing of salt water in open, unlined, surface salt water disposal pits that would not hold

and retain water and thereby allowing it to percolate and to seep into and pollute the sub-surface strata and water sands, violated Rule 20 of the Railroad Commission of Texas which was duly adopted promulgated and published by said Commission and became effective on October 17, 1933, which rule reads as follows:

'Fresh water, whether above or below the surface, shall be protected from pollution, whether in drilling, plugging or disposing of salt water already produced.'

That the violation of such rule constitutes negligence both at common law and negligence per se, and negligence as a matter of law."

In addition to these acts of ordinary negligence, Phillips Petroleum was alleged to have committed gross negligence by disposing of the salt water after November, 1963, and after being advised by the appellants that pollution was occurring.

Among the defenses raised by the appellees, they pled generally the contributory negligence of the appellants and of their predecessors in maintaining the 1956 Sherrod irrigation well and the three test holes as open, uncased and uncemented holes, thereby permitting the salt water to escape from the caliche layer through these holes down to the Trinity fresh water sand.

In short, the case which the plaintiffs sought to make was not for the loss of the 1956 Sherrod irrigation well, nor for damages to the quarter section on which this polluted well was located, but was for diminution of the market value of the entire seven section ranch on the theory that foreseeably, and by gravity alone, the salt water from each of the 17 disposal pits had penetrated the rock of the subsurface strata and had reached and already polluted the fresh water generally under the land or that the salt water would reach and pollute the fresh water generally in the future. As stated, the theory of the

defendants was that the fresh water was protected from any pollution by the impenetrable limestone barrier and that any pollution of the fresh water was brought about by the contributory negligence of the defendants.

Summarizing the jury findings, it may be said that the jury refused to find that either the plaintiffs or the defendants were negligent until after the salt water pollution was discovered in the Sherrod irrigation well in November, 1963; that thereafter only the defendant Phillips was negligent, but that likewise the plaintiffs were contributorily negligent, the negligence of both Phillips and of the plaintiffs being a proximate cause of the water pollution. In addition, the jury determined that the plaintiffs' land "had not been damaged" by reason of any pollution of the fresh water proximately caused by the respective defendants. On these findings, in this negligent action, the trial Court entered judgment for the defendants.

As to the complaints on this appeal, we are first confronted by the appellants' principal contention contained in their first eight points that by the application of Rule 20 of the Railroad Commission together with applicable jury findings, each defendant has been convicted by the jury of committing acts which were negligent per se and which proximately caused the pollution of fresh water underlying the plaintiffs' land.

In the first three issues submitted, the jury found in the language of Rule 20 that in disposing of salt water on plaintiffs' land Phillips failed to protect from pollution the underlying fresh water; the jury then answered "no" to the accompanying negligence inquiry but then found that the failure to protect was a proximate cause of the pollution of the underlying fresh water. Duplicate answers were returned concerning the other three defendants in special issues Nos. 4 through 12. The only Texas decision to date that has directly held that a violation of Rule 20 is negligence per se

and entitles the plaintiff to a recovery without a finding by the jury of negligence is the Court of Civil Appeals' opinion of Gulf Oil Corporation v. Alexander, 291 S. W.2d 792 (Tex.Civ.App.—Amarillo 1956) ref. n. r. e., 156 Tex. 455, 295 S.W.2d 901 (1956). The Supreme Court, however, refused to pass on the question of negligence per se holding it was not necessary to decide for the reason that there was proof of common law negligence in the case.

 The appellants' argument is concise and to the point. Violation of a statute, ordinance, or rule of a regulatory body is generally held to be negligence per se if the damage occasioned by violation of such statute, ordinance, or rule is the damage intended to be prevented by the passage of the rule. Gulf Oil Corporation v. Alexander, supra; Loeffler v. King, 228 S.W.2d 201 (Tex.Civ.App.—Fort Worth 1950) rev'd on other grounds, 149 Tex. 626, 236 S.W.2d 772 (1951); Peterson v. Grayce Oil Co., 37 S. W.2d 367 (Tex.Civ.App.—Fort Worth 1931) aff'd, 128 Tex. 550, 98 S.W.2d 781 (1936); Rozner v. Harrell Drilling Co., 261 S.W.2d 190 (Tex.Civ.App.—Galveston 1953, writ ref'd n. r. e.); Parrott v. Garcia, 436 S.W.2d 897 (Tex.Sup.1969); Missouri-Kansas-Texas Railroad Company of Texas v. McFerrin, 156 Tex. 69, 291 S.W. 2d 931 (1956); William B. Patton Towing Company v. Spiller, 440 S.W.2d 869 (Tex. Civ.App.—Houston (14th Dist.) 1969, no writ); Lewie Montgomery Trucking Co. v. Southern Pacific Company, 439 S.W.2d 691 (Tex.Civ.App.—Houston (14th Dist.) 1969, writ ref'd n. r. e.); Holeman v. Greyhound Corporation, 396 S.W.2d 507 (Tex.Civ.App.—Houston 1965, writ ref'd n. r. e.). The intent of the Railroad Commission in the passage of Rule 20 was to prevent exactly the sort of damage that occurred here. Violations of other rules of the Railroad Commission by oil producers have been held to be negligence per se. The case of Peterson v. Grayce Oil Co., supra, established that a violation of Rule 40 of the Railroad Commission gave the

right of recovery absent any finding of negligence. The rules of the Railroad Commission, including Rule 20, are statutory or legislative in character. Pickens v. Railroad Commission of Texas, 387 S.W,2d 35 (Tex.Sup.1965); L & G Oil Company v. Railroad Commission of Texas, 368 S. W.2d 187 (Tex.Sup.1963); and Harrington v. State, 385 S.W.2d 411 (Tex.Civ.App.— Austin 1964) reversed on other grounds, Tex., 407 S.W.2d 467.

Appellees aim their reply to this argument at the generality of the rule and assert that the language of Justice Smith in the dissent in Brown v. Lundell, 162 Tex. 84, 344 S.W.2d 863 (1961) should be adopted when he stated that:

"There must be something more than the wording of Rule 20 itself to impose both negligence and foreseeability upon the lessees. . . . I cannot conceive of this court holding that Rule 20, which simply says—'Thou shalt not pollute', can be treated as establishing negligence, much less proximate cause."

The following was stated by Allison and Mann in 13 Baylor L.Rev., at p. 212:

"The rule is general in scope. On the other hand a rule could not possibly detail its application to each and every situation of salt water disposition made. It would be difficult to visualize a rule that would minutely cover every detail of every conceivable situation. The end result intended to be accomplished by the rule was the protection of fresh water. If the rule is violated it is a specific act which may or may not be negligence and may or may not be a proximate cause."

 Without attempting to pass on the effect of Rule 20 in every case, it seems to us that the present facts call for a specific finding of negligence as a necessary basis for the establishment of liability. It was the contention of the defendants in the present case that the using of the salt water pits, without lining or other precaution was not negligence due to the 100 feet of

impermeable subsurface material underlying the entire ranch and protecting the fresh water sands. There was in effect a natural lining to the pits present, thicker and more durable than could conceivably ever be constructed by an oil operator. Reading of the charge and jury answers thereto reflect that this position was adopted by the jury. By special issues Nos. 13 through 32 the jury was asked a series of questions centered on the issue as to each defendant as to whether a portion of the salt water placed in the salt water disposal pits penetrated the sub-surface stratas. The jury returned negative answers as to each defendant. Again, in the damage issues, Nos. 41A through 41D, the jury was asked if the plaintiffs' land had been damaged by reason of the pollution of fresh water being proximately caused by each respective defendant. As to each defendant, the jury answered: "It has not been damaged."

A series of the issues submitted in Brown v. Lundell, supra, tracked Rule 20 and were similar to issues numbered 1 through 12 in the instant case. There the jury found that the salt water from Brown's disposal pit penetrated the subsurface fresh water strata and also found that Brown, in disposing of the salt water, failed to protect (Rule 20) the fresh water strata from pollution, that such failures were negligence and that such negligence was a proximate cause. In affirming the case for the plaintiff, the Supreme Court while having an opportunity to apply Rule 20 decided the case as an ordinary negligence action without even discussing Rule 20 in the majority opinion. To the same effect see General Crude Oil Company v. Aiken, 16 Tex. 104, 344 S.W.2d 668 (1961). We hold that under the present facts, a finding of negligence was necessary to base a cause of action.

Among the first eight points are those of no evidence and insufficient evidence attacking the negative answers to the respective negligence questions. Having considered these points under the guidelines of

Garza v. Alviar, 395 S.W.2d 821 (Tex. Sup.1965), they are overruled, together with the balance of the first eight points.

It is hoped that by next discussing the defense of contributory negligence in this case that we can present a better understanding of the problems of this appeal. In connection with contributory negligence, the trial Court submitted to the jury a series of questions beginning with special issue No. 50. Issue No. 50 inquired if salt water was encountered above the Trinity sand when the appellants drilled their first test hole. Issue No. 51 inquired that if salt water was so encountered, if the persons in charge of the first test hole failed to securely plug or case such hole in such a manner as to effectively prevent said salt water from escaping from the strata in which found into the Trinity sand. Issue No. 52 inquired if such failure, if any, was negligence, and issue No. 53 inquired as to proximate cause. A similar set of issues, numbered 54 through 57, were submitted as to the drilling of the second test hole, while those numbered 58 through 61 were in regard to the drilling of the third test hole. The complete set of contributory negligence issues as to the drilling of the second test hole was answered against the appellants.

Special issue No. 66 was to the following effect:

"From a preponderance of the evidence, do you find that salt water reached and polluted the fresh water under Plaintiffs' land by and through Murfee test holes?"

To this issue, the jury answered in the affirmative. By special issue No. 67, they also found that it was negligence on the part of the plaintiffs or their agents to permit salt water to reach and pollute the fresh water by and through said test holes. Finally by issue No. 68, it was determined by the jury that such negligence on the part of the plaintiffs or their agents was the proximate cause of the damages sustained by the plaintiffs.

■ No point or any complaint is made by the appellants to these findings as such, though the appellants do complain that the trial Court erred in making a dual submission as to contributory negligence on those test holes. This will be discussed later. These findings of contributory negligence would bar any normal negligence action. However, this is not necessarily true in this case. It was the appellants' theory that their cause of action was completed upon their discovery of the salt water contamination in the old Murfee irrigation well on November 15, 1963, whereupon the depreciated market value of the seven section ranch occurred. The only issues as to the appellants' damages submitted were as of the time of the discovery of this pollution on November 15, 1963. This was several months before the drilling of the test holes by the appellants. Therefore, the findings of contributory negligence were not an effective bar to the claim made by the appellants for damages against all appellees arising on November 15, 1963.

■ These findings of contributory negligence concerning the test holes, however, did become an effective bar to a subsidiary cause of action alleged by the appellants against Phillips Petroleum Company. They alleged and offered proof that after November 15, 1963, they advised Phillips that the disposal of salt water in the unlined disposal pits was polluting the underground water and that after being so advised, Phillips negligently continued to so dispose of the salt water.

In response to special issues numbered 33, 34, 35 and 36, the jury found that Phillips Petroleum Company continued to place salt water in unlined pits after learning of the pollution; that such was negligence, gross negligence, and a proximate cause of the pollution of the appellants' fresh water. The contributory negligence of the appellants regarding their own test holes which was determined by the jury to be a proximate cause of the damages sustained by them thus became a bar to this subsidiary

recovery against Phillips. As to this, the parties are in accord.

■ As stated above, appellants' only complaint in regard to the contributory negligence issue is that there was a dual submission in the Court's charge by special issues numbered 50 through 61 which related to the individual test holes on the one hand and by special issues numbered 66 through 68 where the trial Court again inquired as to whether the appellants allowed salt water to reach their fresh water through the test wells as a whole and whether such act was negligence and proximate cause of the pollution. Admittedly, the issues are similar; however, issues numbered 50 through 61 were grounded in the terms of Article 848a of the Penal Code, Vernon's Ann.Tex.Civ.St., which requires that when a water well is drilled which encounters salt water that the owner of the well will securely plug or case the well so that the salt water is effectively prevented from escaping from the strata in which found into any other water bearing strata. Issues numbered 66 through 68 are grounded on common law negligence and concern themselves with the concept that the salt water reached and polluted the fresh water at a later time than the time inquired about in special issues numbered 50 through 61. We hold that the special issues did not amount to a dual submission of precisely the same factual situation.

■ From a review of the entire record in the case we further hold that if there was error it was not reasonably calculated to cause nor did it probably cause the rendition of an improper judgment. Rule 434, Texas Rules of Civil Procedure; Holmes v. J. C. Penney Company, Inc., 382 S.W.2d 472 (1964); H. E. Butt Grocery Company v. Quick, 442 S.W.2d 798 (Tex.Civ.App.—San Antonio 1969, writ ref'd n. r. e.); Jackson v. International Service Insurance Company, 450 S.W.2d 896 (Tex.Civ.App.—Fort Worth 1970, writ ref'd n. r. e.); McDonough Brothers, Inc. v. Lewis, 464 S.W.2d 457 (Tex.Civ.App.—San Antonio

1971, writ ref'd n. r. e.). The appellants' complaint as to dual submission is overruled.

■■ From a preponderance of the evidence, the jury determined in answer to issues numbered 44 and 45 that the reasonable market value of the plaintiffs' land immediately before the November 1, 1963, discovery of pollution was $55.00 per acre, and that the reasonable market value of the land immediately after such discovery was at $45.00 per acre. The plaintiff Murfee and his two appraisers were of the opinion that the reasonable market value of the land before pollution was from $75.00 to $80.00 an acre, while the value after pollution was $25.00 an acre. The appellees' appraiser testified that the before discovery value was at $40.00 per acre and that after discovery it was $35.00 an acre. The appellants thus complain by no evidence and insufficient evidence points that since the highest value placed on the land after pollution was at $35.00 per acre that the jury's finding of $45.00 per acre is insupportable. We note that there was substantial evidence presented from which the jury could make its own determination. There were extensive photographs showing cotton under irrigation and maize growing on the land after the alleged pollution. The four windmill wells in existence on the land since 1941 were still producing sweet water at the time of trial in addition to six irrigation wells drilled on the land producing good water after the discovery of the pollution. While the jury's answer to the after value was above the range of testimony on that specific issue, the answer was higher than the lowest testimony on the after-value issue and well within the range of the entire testimony. No error is presented. Ker v. State, 462 S.W.2d 380 (Tex.Civ.App.—El Paso 1970, writ ref'd n. r. e.). Likewise, on land valuation, the jury may weigh and accept the opinions as to value, or it may form its own opinion from the evidence, and by utilizing its own experience and matters of common knowledge. State v. Dickson, 401 S.W.2d 361 (Tex.Civ.App.—Waco 1966, writ ref'd n. r. e.). After reviewing the entire evidence, these points are overruled.

■ Troublesome points are presented that urge the existence of irreconcilable conflict in the jury answers relating in the main to the damage issues. By answers to issues numbered 41A, 41B, 41C and 41D the jury found that the plaintiffs' land damage by pollution of fresh water was not proximately caused by each defendant. Other issues determined that the land damage by reason of pollution was permanent and that the value of the land before and after discovery of the pollution decreased by $10.00 an acre. Under the view adopted by the majority that a nonnegligent failure to protect the fresh water from pollution did not create a cause of action, we have at best an immaterial conflict. A conflict in jury findings will not prevent the rendition of a judgment and require a mistrial unless the findings, considered separates and taken as true, would compel the rendition of a different judgment. Bradford v. Arhelger, 161 Tex. 427, 340 S.W.2d 772 (1960). Regardless of how they are considered, a different judgment could not have been entered without a finding of a negligent act. The complaint is to an immaterial conflict which is not reversible. Little Rock Furniture Mfg. Co. v. Dunn, 148 Tex. 197, 222 S.W.2d 985 (1949). The points on conflicting answers are overruled. Under the view adopted by the minority, these points of necessity are discussed in more detail.

■ Complaint is made that the trial Court erred in refusing to permit two witnesses, Hoelscher and Eggemeir, to testify that the water on lands owned by them had been polluted by brine emptying into surface pits. Hoelscher had a farm located some six miles north of the Sherrod ranch and would have testified that some twelve years before he thought he had a salt water pollution problem with a water well located approximately 300 feet from a salt water pit. Eggemeir's farm was located

some five miles to the north of the ranch and he at one time drilled a water well which was salty, it being some 500 yards from a salt water pit. As to this testimony, with no showing of similarity of conditions, we fail to see materiality and relevancy. It would be collateral to the matter involved and confusing to the issues presented. Gruss v. Cummins, 329 S.W.2d 496 (Tex.Civ.App.—El Paso 1959, writ ref'd n. r. e.); 23 Tex.Jur.2d 182. Likewise, we fail to see any abuse of discretion. Payne v. Hartford Fire Insurance Company, 409 S.W.2d 591 (Tex.Civ.App. —Beaumont 1966, writ ref'd n. r. e.).

■ Appellants complain of the action of the trial Court in allowing each defendant six peremptory challenges. This permitted a total of thirty challenges, as one defendant with whom we have not been concerned was dismissed during the trial. The case was tried under the provisions of Rule 233, T.R.C.P., and unaffected by the later legislative amendment to Art. 2094, V.A.T.C.S., as amended by Acts 1971, 62nd Leg., R.S., ch. 905, sec. 13, p. 2801. Whether the defendants were each entitled to the six peremptory challenges depended on whether they had interests that were, at least in part, antagonistic on one or more fact issues, and on a matter with which the jury was going to be concerned. It appeared from the pleadings and discovery matters on file when the trial judge was required to rule on the matter that fact issues would arise between the defendants. Retail Credit Company v. Hyman, 316 S. W.2d 769 (Tex.Civ.App.—Houston 1958, writ ref'd). It can be said here that the separate challenges were proper as separate verdicts might have been reached, the issues were different between the defendants, many of the claims were conflicting and the interests of the defendants were antagonistic. 3 McDonald, Texas Civil Practice, Sec. 11.12.2. While the claims for indemnity and contribution alone filed by each defendant over and against the other might not have justified the increased challenges, Turner v. Turner, 385 S.W.2d 230 (Tex.Sup.1964), real antagonism was present. As an example, Barnhart was the target of the other defendants as it was the Barnhart salt which probably caused the pollution of the 1956 Sherrod irrigation well. In its own turn, Phillips came under the guns of the other defendants as it alone operated the unit after 1962 and particularly after the discovery of pollution in 1963. The jury could well have acquitted any one defendant of negligence and found the others liable. Tamburello v. Welch, 392 S.W.2d 114 (Tex. Sup.1965). Again, if it can be assumed that the defendants collaborated in exercising the peremptory challenges, no error is reflected. Brown & Root, Inc. v. Gragg, 444 S.W.2d 656 (Tex.Civ.App.—Houston (1st Dist.) 1969, writ ref'd n. r. e.). Any complaint made that the defendants were permitted to construct a jury is not borne out by the facts. The point is overruled.

■ The trial Court charged the jury that "In connection with the definitions of 'negligence' and 'ordinary care', you are instructed that while compliance with a custom or conformity with usual and ordinary practices is not an absolute test of freedom from negligence, you may nevertheless properly consider the usual and customary practices of other operators engaged in the same or similar business and whether the defendants complied therewith, in determining whether any of the defendants was guilty of negligence." Complaint is made as to the adequacy of the instruction in that there should have been added that "A custom may, in itself, be negligent." This additional instruction was sufficiently covered. The charge was approved in Brown v. Lundell, supra. No error is shown.

We have considered all of the appellants' points and they are overruled. The judgment of the trial Court is affirmed.

PRESLAR, Justice (dissenting).

I respectfully dissent and would reverse the judgment of the trial Court, in the belief that we are committed to apply Rule

20 of the Railroad Commission to this case, and that there is conflict in the issues found by the jury which requires a remand.

As to the application of Rule 20, the jury found that each defendant (issue No. 1) "in disposing of salt water on Plaintiffs' land . . . failed to protect from pollution fresh water underlying Plaintiffs' land," (issue No. 2) such failure was not negligence, and (issue No. 3) such failure was a proximate cause of the pollution of fresh water underlying plaintiffs' land.

In Gulf Oil Corporation v. Alexander, 291 S.W.2d 792 (C.C.A.1956), the Amarillo Court of Civil Appeals decided the exact question before us, so that we have the choice of following that decision or being in direct conflict with it. There is no distinction to be made between the two cases, except theirs was an adjoining landowner to the oil and gas lessee while ours is an owner of the surface only on the same premises as the oil and gas lessee. The distinction has no bearing under the theory on which the cases were tried. The Amarillo Court held that there was no evidence of negligence, but that the landowner was entitled to recover because of the violation of Rule 20, saying:

"In the light of the above authorities, it must be observed that the rule at issue in the cause here on appeal is not a legislative enactment but it is a rule duly promulgated by the Railroad Commisssion of Texas under express authority from the legislature. There is no proof of negligence in the cause other than might arise from the undisputed proof that appellant in polluting appellee's fresh-water strata violated a duty placed on it by Rule 20. Irrespective of any technical discussion of the principles of negligence, it is ruled that the violation of Rule 20 by appellant in polluting the fresh water supply of appellee's irrigation well gave right to the cause of action on the part of appellee for his dam-

age suffered by reason of such violation."

As noted by the majority, the Supreme Court (156 Tex. 455, 295 S.W.2d 901) refused applications for writ of error in a Per Curiam opinion saying:

"We have concluded that there is evidence to support the jury findings of common law negligence and proximate cause, and both applications are denied with the notation 'Refused. No reversible error.' This order must not be taken as indicating either approval or disapproval of the views expressed by the Court of Civil Appeals as to the legal effect of Rule 20 promulgated by the Railroad Commission of Texas. 291 S.W.2d 792."

Since the holding of another Court of Civil Appeals still stands, not being disapproved, it seems to me that the better course is for this Court to apply the law in accord with it. Also, it can be argued that the Supreme Court was in accord with the application of Rule 20, under some view, in their opinion in Brown v. Lundell, 162 Tex. 84, 344 S.W.2d 863 (1961) in which the evidence as to negligence was practically the same as in the case before us. In Brown v. Lundell, the majority opinion makes no mention of Rule 20, but the dissent makes a valid argument that the majority was applying it, without name. In Brown v. Lundell, the parties were lesser and lessee in an oil and gas lease on the premises involved with certain of their rights and duties controlled by the lease. In fact, one imminent writer has observed that the dissenting opinion was founded principally on reasoning that it had not been demonstrated that the defendant used more land than was reasonably necessary, as allowed by his lease. Browder, The Dominant Oil and Gas Estate, 17 Sw.L.J. 25. Because of the application of Rule 20 by the Amarillo Court of Civil Appeals in Gulf Oil Corporation v. Alexander, and because of the language of the Supreme

Court in Brown v. Lundell, I am of the opinion that we should apply Rule 20 in this case.

It is possible to resolve all conflicts in the jury findings except those pertaining to damage. There are findings that there was no damage. These conflict with findings that there was a diminution in market value, that the damage was permanent, that there was a failure to protect which proximately caused pollution, and that salt water ran down the walls of the Sherrod well into the fresh water formation. Obviously the conflict between damage and no damage is a material one from which different judgments would result, and requires a reversal, if it cannot be resolved. By issues numbered 41A, 41B, 41C, and 41D, the jury found as to each defendant an issue like the following 41A:

"Do you find from a preponderance of the evidence that Plaintiffs' land has been damaged by reason of the pollution, if any, of fresh water under Plaintiffs' land, proximately caused by Phillips Petroleum Company."

Answer: "It has not been damaged."

By the very next issue, No. 42, the jury found that "the damage, if any, to Plaintiffs' land by reason of pollution, if any, of fresh water" is permanent. Conflict: The damage is permanent, but there is no damage. By issue No. 43, it was determined that the plaintiffs discovered salt water pollution in the irrigation well in the NE/4 of Sec. 44 on or about November 15, 1963. Conflict: There is salt water in the irrigation well, but no damage, by reason of pollution. By issue No. 44 it was determined that "the reasonable market value of plaintiffs' land immediately before such discovery of the salt water pollution," was $55.00 per acre. By similarly worded issue No. 45, it was determined the value of "Plaintiffs' land" was $45.00 per acre immediately after discovery of the salt water pollution. Conflict: Salt water pollution reduced value of "Plaintiffs' land" by $10.00

per acre, but there was no damage to "Plaintiffs' land," by reason of pollution.

And as noted earlier, by issues Nos. 1 and 3, the jury found that the defendants failed to protect the fresh water from pollution, and such failure was a proximate cause of the pollution of such fresh water. Add to that the findings by issue No. 62:

"Do you find from a preponderance of the evidence that salt water reached the Trinity sand in the 1956 Sherrod irrigation well by running down the sides of the uncased hole?"

Answer: "We do."

The jury made additional findings as to this well: By issue No. 72 it was found that the cash market value of the one-quarter section on which it was located could not be restored to what it was prior to the discovery of salt in it by drilling additional wells, nor, (issue No. 74) by casing it and pumping thousands of barrels of water out. A conflict with the "no damage to plaintiffs' land" issues can only be avoided by taking the unreasonable position that pollution by salt of the fresh water in a well used for irrigation purposes does no damage. Even then, such untenable position would be in conflict with findings as to diminution of fair market value. Another way to avoid conflict would be to assume that when the jury found there was no damage to plaintiffs' land they were thinking only of the surface with its growing crops. This would be an unwarranted assumption in view of the plain use of the word "land" in each of the issues.

My summation of this case is that liability is established because the prior decisions discussed make applicable Rule 20 of the Railroad Commission and eliminate the necessity for a finding that the failure to protect was negligence. I make no determination as to the evidence on the negligence issue, but would simply follow the law as I believe it has been interpreted. This is more than a "thou shall not pollute interpretation since it requires proof of a

failure to protect which proximately causes pollution of fresh water. A judgment of remand is required because of the conflicts as to the damages.

There remains the matter of contributory negligence mentioned by the majority. There is none on the primary case, which is based on the Sherrod well. It was found to be salty on November 15, 1963. The damage issues were as to value before and after that date, so any failure to case that well after that date or any drilling of the Murfee test holes after that time had nothing to do with the damages found to exist on November 15, 1963. At the time the damages occurred, plaintiffs had no duty to case the Sherrod well. Art. 848a of the Penal Code says that "Every water well drilled, dug, or excavated in this State which encounters salt water . . ." shall be cased, etc. Until the pollution occurred, the Sherrod well had no salt water and Art. 848a did not apply. Any argument that the finding of issue No. 62 that salt water reached the Trinity sand by running down the uncased walls of the Sherrod well constituted a violation of Art. 848a is without merit. As the issue stands in this record, it is merely an evidentiary finding as to how the defendants polluted. It thus harmonizes with the finding that they "failed to protect." It must be remembered, that this is plaintiffs' land on which defendants have placed enormous amounts of salt in reliance on its not being able to penetrate the limestone. But that limestone and the fresh water under it are also plaintiffs' and they may drill and leave uncased wells as they please, in the absence of conditions set out in Art. 848a. By bringing the salt water from below and placing it above the plaintiffs' fresh water, defendants have cast the burden on the plaintiffs to case it off wherever it is encountered or be in violation of Art. 848a. Salt water had not been encountered by the plaintiffs in the Sherrod well and there was no duty to case it prior to November 15, 1963.

I would reverse and remand this case.